# In the United States Court of Federal Claims

No. 09-420T

(Filed: Feb. 29, 2012)

* * * * * * * * * * * * * * * * * * * * * *

SUNDANCE HELICOPTERS, INC.,

               *Plaintiff*,

v.

THE UNITED STATES,

               *Defendant*,

Air Transportation Excise Tax; "established line" exception; failure to enact Treasury Regulations

* * * * * * * * * * * * * * * * * * * * * *

    *R. Glenn. Woods*, Henderson, Nevada, for plaintiff.

    *Michael James Ronickher*, United States Department of Justice, Tax Division, Washington, D.C., with whom were *John A. DiCicco*, Principal Deputy Assistant Attorney General, *Mary M. Abate*, Acting Chief, Court of Federal Claims section, and *G. Robson Stewart*, Assistant Chief, Court of Federal Claims section for defendant.

_____

OPINION

_____

BRUGGINK, *Judge*.

    This is an action for refund of Air Transportation Excise taxes paid by plaintiff. Before the court are the parties' cross-motions for summary judgment. The broad issue is whether plaintiff operates on "an established line" by flying standardized helicopter sight-seeing tours, and if it does, whether plaintiff has a legal obligation to collect and pay the tax. Briefing is complete, and we heard oral argument on February 2, 2012. For the reasons explained below, we deny plaintiff's motion for summary judgment and grant in part and deny in part defendant's cross-motion for summary judgment.

BACKGROUND[1]

This dispute arises from an excise tax audit conducted by the Internal Revenue Service ("IRS") to check compliance with the Air Transportation Excise Tax, I.R.C. § 4261 (2006),[2] for the period March 31, 2004 through September 30, 2005 (the "disputed period"). The IRS concluded that plaintiff owed $2,970,494 in tax, plus $742,623 in penalties. Plaintiff paid a portion of the taxes assessed, and brought suit here seeking a refund. We note that this dispute is of limited application because Congress subsequently amended the Air Transportation Excise Tax to expressly exempt sight-seeing flights from the tax effective September 30, 2005. Safe, Accountable, Flexible, Efficient Transportation Equity Act, Pub. L. 109-59, § 11124(a), 119 Stat. 1144, 1952-53 (2005).[3]

I.      Overview of Sundance's Tours

Sundance Helicopters, Inc., was founded in 1985 and was, as of 2005, the largest helicopter aviation company in Nevada. It provides helicopter tours, charter flights, utility flights, and government flights. Sundance provides aerial tours of areas such as the Las Vegas "Strip," the Grand Canyon, the Colorado River, and portions of the Hualapai Indian Reservation. It flies exclusively a fleet of six-passenger helicopters. During the disputed period of a year and a half, Sundance flew 151,763 passengers.

Although plaintiff prefers to view all of its flights as "charter," in fact its own books and records indicate that it segregates purely charter flights from packaged sight-seeing tours. Deposition testimony by Sundance employees makes clear that it views one-of-a-kind bookings by film crews, fire suppression crews, or government agencies as different from standardized

---

[1] These facts are derived from the parties' proposed findings of fact and are uncontested unless noted.

[2] All citations to "I.R.C." refer to the Internal Revenue Code of 1986, as amended, within Title 28 of the United States Code.

[3] This exemption thus does not cover plaintiff's operations during the disputed period. *See* Pub. L. 109-59, § 11124(b), 119 Stat. at 1952-53 ("The amendment made by this section . . . shall not apply to any amount paid before [September 30, 2005].").

2

tourist flights.   Such true charter flights are routed to separate in-house schedulers.  Charter flights are billed at an hourly rate rather than on a per-seat basis.  Prices are determined by estimated flight time, estimated additional fees from use of fuel trucks, on-site maintenance, and landing and flight clearances.[4]  Plaintiff's financial statements also differentiate between the "tour sales," at issue here, and "charter sales."  For the years ending March 31, 2004, and 2005, tour sales were $17.8 million and $18.7 million, respectively. During the same periods, charter sales accounted for $1.6 million and $1.7 million in revenue. The government concedes that these charter flights are not subject to the Air Transportation Excise Tax.

For the balance of its flights, which the government contends are subject to the tax, plaintiff offers standardized sight-seeing tours. Plaintiff's most popular tour is the "Grand Canyon Picnic," which accounts for ninety percent of plaintiff's tour flights from McCarran International Airport near Las Vegas and the majority of its tour revenue.  This tour includes flights over Lake Mead, Hoover Dam, extinct volcanoes, and culminates in a landing in the Grand Canyon for a picnic.  On the return leg, the helicopter flies above the Las Vegas Strip.   There are variations of this tour that are known as the Escape, Sunset Escape, or the Grand Canyon Wedding. Plaintiff also offers group tours, which generally use the standard tours, such as the Grand Canyon Picnic or the VIP Deluxe. Plaintiff's other tours include flying customers from Grand Canyon West Airport into the canyon to connect with boat tours.

In most cases, customers are provided limousine transportation both from and to their hotel.  Plaintiff's tours offer narration in several languages corresponding to landmarks along the route.

II.     Sundance's Advertising and Reservation Practices

Plaintiff prints over 100,000 brochures every six months for distribution to tour operators, hotels, and other vendors.  These brochures describe the details of the tours offered by plaintiff, including price and duration.  *See*

---

[4] While the facts relating to the existence of a separate Charter Department are contested, no Air Transportation Excise Tax was levied on those flights.  Consequently, we view these facts as neither necessary nor material to establish whether plaintiff's tour flights, on which excise taxes were levied, operate on an established line.

Def.'s Ex. 16, 17.  They do not specify a time of departure.  This is in part because most trips are conducted in daylight, and the number of daylight hours fluctuates during the year.  The brochures indicate that "Tour times may vary depending on aircraft and weather . . . . Tours require a minimum number of passengers to operate.  24-hour cancellation notice required," and that "Prices and tour itineraries are subject to change without notice."  *See* Def.'s Ex. 16, 17.

Tours are reserved primarily by third-parties, such as tour operators and travel agencies, as well as directly by the customer.  During the disputed period, approximately three hundred third-party vendors sold Sundance tours.  Most of plaintiff's passengers during the disputed period came from hotels and independent travel agencies.  Between 15% to 20% were walk-ins and direct bookings.

Third-party vendors establish a tour sales agreement with plaintiff.  These agreements, which are valid typically for six months, provide the retail price, net rate, fees passed to the customer, and the commission collected by the third-party.  The commission is the difference between the retail price paid by the customer and the net amount paid to Sundance.  The retail rate is generally the same for all third-parties, which is typically the rate published in the brochure.  Although the net rate may be negotiable, plaintiff has the final authority.  Plaintiff accepts three modes of payment from its third-party sellers: (1) cash on demand, which the customer pays Sundance directly, (2) "net 30," in which the customer pays the third-party seller, and the seller pays plaintiff within 30 days of travel, and (3) by voucher, in which the customer pays the third-party seller and receives a voucher that the customer presents at the flight terminal, which plaintiff then redeems from the third-party seller.

Plaintiff uses a computerized internal reservation process consisting of a system of drop-down lists on a computer screen showing available tours on a given day.  The reservation process generally takes less than three minutes to complete, including data entry.  Direct bookings may take longer, depending on the customer's knowledge about the tours.  Internet customers generally request an approximate time of the day for the tour, and through an iterative process between the reservation agent and the customer, a specific time is established.  For third-party bookings, which occur primarily over the phone or Internet, a specific departure time is negotiated through the same iterative process with Sundance.

4

III.    Sundance's "Preferred Model"

Plaintiff seeks to reserve customer flights based on a "preferred model" in an attempt to allocate efficiently Sundance's helicopters throughout the day by managing occupancy.  On any given day, the preferred model shows the Sundance reservation agent the projected flight times for each helicopter.  This schedule is not seen by the third-party or the customer.  Although it changes throughout the year, this model is essentially established by ascertaining the earliest possible flight for the day (normally sunrise) for a particular helicopter, adding two hours and fifteen minutes for each round trip, and then adding a thirty minute buffer.  The model then continues flights until sunset.  The time slots allowed under this model, generally two hours and forty-five minutes, allow plaintiff to accommodate its most popular tour, the Grand Canyon Picnic.  By determining the number of daylight hours in a given day, the duration of the most popular tours, and by setting up optimal flight times, plaintiff achieves the most flights possible from each helicopter in a day.

The times generated by the preferred model are not published, although we note that Defendant's Exhibit 22, which contains menus for the various tours, shows specific flight times for morning, mid-morning, and afternoon flights.  When reserving flights for customers, plaintiff's reservation agents review the preferred model with the indicated projected times slots available, and offer one or more options to the customer or third-party based on the preferred model, which the customer can then choose or reject.  Plaintiff's reservation agents direct customers to times within the preferred model, but unless a customer objects, plaintiff will combine flights, reschedule, or move passengers in an effort to get the maximum use out of its helicopters.  The preferred model thus may not be adhered to every day.

Along with the preferred model, due to efficiency and revenue considerations, plaintiff will not send out a flight with less than three or four passengers, the minimum number of seats to breakeven financially. Customers can purchase additional unused seats to make it a private flight.  If the minimum seat quota is not met, plaintiff may offer the customers a different time or tour.  Plaintiff strives to get its aircraft as full as possible and averages 5.8 passengers per flight.

IV.    Sundance's Flight Operations

Plaintiff operates pursuant to a Federal Aviation Administration Part 135 certificate. During pilot training, plaintiff teaches its pilots the tour routes, which plaintiff's Director of Operations, Kurt Barton, has described as "canned flight plan[s]." Kurt Barton Dep. 26:10-25, Sept. 1, 2010. Specific flight plans are required and enforced by the FAA and National Park Service within the Grand Canyon. Deviating from these paths for any reason other than safety can lead to a violation for the pilot, who can face fines and license forfeiture. Additionally, over the Hualapai Indian Reservation in the western portion of the Grand Canyon, flights are similarly restricted to approved routes. The skies surrounding McCarran International Airport are likewise restricted to set flight paths. Plaintiff has entered into letters of agreement with the FAA and other flight operators dictating permissible routes and altitudes for other designated areas, such as Lake Mead.

It is possible for customers to request in-flight deviations within these corridors, but these deviations must comport with flight route restrictions, and customers must pay the charter rate for any significant deviations. Such a deviation will not be granted without the consent of all passengers because it may involve additional expense. The pilot of the helicopter at all times retains the right to veto any deviations and may do so if concerned about safety or maintaining the schedule for the day.

V.    Sundance's Previous Dealings with the IRS

Plaintiff contends that it was previously audited by the IRS in 1994 for Air Transportation Excise Tax compliance. Sundance thereafter requested a written determination confirming that it was not subject to the tax. Plaintiff offers a letter dated April 5, 1995, from Larry R. Gillich, an IRS revenue agent, to plaintiff's counsel. *See* Pl.'s Ex. at 5-7.[5] In this letter, Agent Gillich states, "it appears that your business operation of providing non-scheduled charter flights to customers would not constitute air transportation taxable under [section] 4281 and accompanying regulations." Pl.'s Ex. at 5.

---

[5] Plaintiff has provided twenty exhibits spanning hundreds of pages to the court. These exhibits are consecutively paginated, and for the sake of clarity, we refer to the exhibits collectively ("Pl.'s Ex."), and cite to individual page numbers instead of exhibit numbers.

Defendant does not deny that the letter was written by Agent Gillich, but contends that it was not the result of an official audit. Defendant points to another letter plaintiff addressed to Agent Gillich, dated November 21, 1994, in which plaintiff seeks confirmation that there would be no official audit: "based upon the materials submitted to you [Agent Gillich] in advance of the audit, you would not be auditing the federal excise tax accounts of Helicopter Services of Nevada for the year 1993 or for any prior year." Pl.'s Ex. at 6. Defendant also points out that the "determination letter" reflects "Tax Period: N/A." Defendant argues that, in any event, Agent Gillich's letter is not an "official" written determination that binds the IRS. According to defendant, such official determinations arise only from Private Letter Rulings, Technical Advice Memoranda, Chief Counsel Advice Memoranda, or an Examination Report after an audit. The language used in the letter also reflects the lack of a formal ruling: "From my conversations with your representative, Mr. R. Glen Woods, it appears your business [does not constitute taxable transportation]." Pl.'s Ex. at 5.

VI.    Sundance's Audit

On March 7, 2007, the IRS issued an examination report asserting that plaintiff owed Air Transportation Excise Tax pursuant to I.R.C. § 4261 because it had been operating flights on an established line. *See* Pl.'s Ex. at 8. This report asserted that plaintiff owed $2,970,494 in taxes, plus penalties of $742,623 for the calendar quarters ending March 31, 2004 through September 30, 2005. Plaintiff takes the position that it was subject to and paid the Aviation Fuel Excise Tax[6] rather than Air Transportation Excise Tax, in part because it relied on Agent Gillich's letter. It therefore asserts that, "If an adjustment of Air Transportation Excise Tax is to be made in the Government's favor, Sundance must be afforded . . . a credit for Aviation Fuel Excise Tax already paid." Pl.'s Ex. at 61.

In its claim for refund, plaintiff also asserts that the IRS failed to account for amounts plaintiff received to cover non-air transportation expenses, such as ground transportation, meals, beverages, videotapes, DVDs, photographs, National Park fees, and other services. According to plaintiff, the rates charged to its customers during the disputed period included these non-air transportation services, which should not be subject to the tax.

---

[6] I.R.C. § 4081 levies an excise tax on aviation fuel.

Defendant responds that plaintiff has failed to document these separable charges as required by Treasury Regulation § 49.4261-2(c).

Plaintiff also asserts that the IRS assessed penalties against it without identifying the type of penalty or the sections under which the penalty was assessed. Defendant contends it was sufficient to identify the penalties as "Failure to File Tax Return," and "Failure to Pay Tax" under IRC § 6651(a) and (b), throughout the documents provided to plaintiff at the conclusion of the audit. *See* Pl.'s Ex. at 11 (noting "Penalties assessed per IRC section 6651-Failure to File Tax Return or to Pay Tax").

After receiving the examination report, plaintiff's counsel, R. Glenn Woods, sent a letter protesting the report. Pl.'s Ex. at 40-49. Along with the letter, plaintiff paid $823.31, which is a divisible portion of the Air Transportation Excise Tax assessed for the disputed period. Plaintiff filed suit here in June 2009 seeking a refund and abatement of its Air Transportation Excise Taxes.

## DISCUSSION

I.R.C. § 4261 imposes an excise tax on "taxable transportation." Section 4261(a) imposes a tax of 7.5% on the amount of taxable transportation paid, and I.R.C. § 4261(b) imposes a fixed dollar amount tax on each domestic segment of taxable transportation. Taxable transportation includes "transportation which begins in the United States . . . and ends in the United States." I.R.C. § 4262.

Section 4281 carves out an exemption to the tax imposed by I.R.C. § 4261, however, for aircraft that have a maximum certificated takeoff weight of 6,000 pounds or less, except when such aircraft is "operating on an established line." There is no dispute that plaintiff satisfies the 6,000 pounds ceiling. Thus, plaintiff is not subject to the Air Transportation Excise Tax unless it "operates on an established line" within the meaning of I.R.C. § 4281. Plaintiff contends that it does not operate on an established line because its business amounts to chartered sight-seeing tours controlled by customers. Defendant argues that plaintiff operates on an established line because it provides regular flights on fixed routes and exercises great control over them.

A motion for summary judgment can be granted only if there is no genuine dispute as to any material fact. Rule 56(c) of the Rules of the United

States Court of Federal Claims ("RCFC").  The question before us is whether there are any disputes with respect to material facts concerning plaintiff's liability for the Air Transportation Excise Tax and its obligation to remit those taxes if due.  We are of the opinion that no such dispute exists with respect to the principal questions of whether plaintiff operates on an established line and whether it is liable to remit the tax.  Those issue are ripe for summary judgment. As we explain later, however, there are genuine disputes of material facts relating to the amount of tax owed.

A.   Plaintiff operates on an established line and is therefore subject to the Air Transportation Excise Tax

1.   Treasury Regulations and Revenue Rulings

Treasury regulations clarify that "operation on an established line" means:

> operated with some degree of regularity between definite points. It does not necessarily mean that strict regularity of schedule is maintained; that the full run is always made; that a particular route is followed; or that intermediate stops are restricted.  The term implies that the person rendering the service maintains and exercises control over the direction, route, time, number of passengers carried, etc.

Treas. Reg. § 49.4263-5(c).  There are thus three elements to an established line.  First, operating on an established line means "operat[ing] with some degree of regularity."   Second, this regularity must be "between definite points."   Third, the flight operator must maintain control over "the direction, route, time, number of passengers carried, etc." Due to the presumption that the tax assessed is correct, plaintiff bears the burden of showing that these elements are not present.

The parties call our attention to two Revenue Rulings which apply the established line concept.  In Revenue Ruling 72-219, 1972-1 C.B. 350, the Service considered whether an airline which operated on both a regularly scheduled and unscheduled basis qualified for the exemption.  It ruled that the basic service was regularly scheduled and that the addition of unscheduled flights between the same points did not alter the fact that the service was operated with "some degree of regularity between definite points."

Additionally, the airline, in rendering the additional unscheduled flights, maintained control over the direction, route, time, and number of passengers.

By contrast, in Revenue Ruling 72-617, 1972-2 C.B. 580, the Service came to a different conclusion with respect to an airline which flew regular mail flights for the United States Postal Service.  The Service held that the airline qualified for the exemption because its operation did not constitute an established line.  The Service noted that the "arrangement between the Postal Service and the operator of the aircraft is, in effect, a charter . . . ."  Although the airline regularly flew the mail flights, it did not meet the control test because the Postal Service, and not the airline, maintained control over the flight schedule and had exclusive use of the aircraft with respect to the mail flights.  Moreover, the airline did not otherwise serve the mail destination cities on a regular basis.

> 2.  Other courts' interpretation of "operated on an established line"

While the established line concept is a matter of first impression in this court, three district courts in the Ninth Circuit have considered the issue.  The most recent decision is by the District Court of Hawaii in *Schuman Aviation Company LTD. v. United States*, in which the court held that a Hawaiian helicopter tour company operated on an established line.  *See* 2011 WL 3956724 *1-2 (D. Haw. Sept. 6, 2011).  The court found that all three elements of Treasury Regulation § 49.4263-5(c) were met because the flights: "(1) operated with some degree of regularity (2) between definite points, and (3) 'the person rending the service maintains and exercises control over the direction, route, time, number of passengers carried, etc.'" *Id.* at *6 (quoting Treas. Reg. § 49.4263-5(c)).  The circumstances in *Schuman* were very similar to the ones here.  Schuman controlled the tour route, including sights, length of trips, and departure times in an attempt to maximize efficiency.  *Id.* at *11.  The fact that the regularity of the flights varied with customer demand did not prompt a different result because, as the court noted, the regulations require only "some degree of regularity."  *Id.* at *9.  The court held that a substantial number of flights, standing alone, would not constitute the required regularity, but noted that, due to the predictability of the flights, customers could be assured that Schuman flew multiple tours a day.  *Id.*  Schuman thus operated with "some" degree of regularity.

In *Lake Mead Air, Inc. v. United States*, the Nevada District Court held that the flight operator was subject to the tax, but also held that the operator

had no duty to collect it. *See* 991 F. Supp. 1209 (D. Nev. 1997). In that case, the air carrier operated a fleet of aircraft which provided scenic tours around the Grand Canyon. The carrier provided many of its flights to customers of a tour company, which advertised the air tours. *Id.* at 1210. The air portion of the tours always consisted of taking the customers on a tour of the Grand Canyon lasting approximately an hour and a half. *See id.* The court construed the concept of regularity to include both the "frequency of travel over a certain area and the control exercised by the person rendering the service." *Id.* at 1212. The court noted that the crux of the established line element "seems to be that the public can rely on the transportation because of a regularity determined by the provider, not the customer, i.e., the whims of customers do not dictate a particular route." *Id.*

The court held that the "definite points" requirement was satisfied, even though the routes began and ended at the same place. It pointed to Treasury Regulation § 49.4261-1(c), which provides: "It is not necessary that the transportation be between two definite points. If not otherwise exempt, a payment for continuous transportation beginning and ending at the same point is subject to the tax."

In *Northstar Trekking LLC v. United States*, the Alaska District Court came to a different conclusion with respect to a helicopter operator offering tours to and from glaciers. 637 F. Supp.2d 676 (D. Alaska 2009). Northstar offered "glacier treks," which allowed passengers to explore the Juneau Ice Field. The company used twenty-two different landing zones, and rented its planes on an hourly and per seat basis. The court found that the customers controlled tour duration, destination, and general route of the flights, which could be used to explore parts of a 1,500 square mile glacial field. *See id.* at 680-81. Furthermore, the court held that flights "destined for various locations on an icefield which allowed passengers to get out to engage in activities on a glacier are not flights conducted 'between definite points,'" because the glaciers were the actual destination and not a mere intermediate stop. *Id.* at 683. The court concluded that Northstar's customers controlled the flights, removing them from the tax's ambit. *Id.* at 681.

The persuasiveness of *Northstar*, however, is drawn into question by the more recent decision of the Ninth Circuit in *Temsco Helicopters, Inc. v. United States*, 409 Fed. App'x 64 (9th Cir. 2010). Like Northstar, Temsco offered Alaskan sight-seeing helicopter tours, including glacier stops, primarily to cruise ship passengers. The Ninth Circuit held that the tours were

offered with sufficient regularity to satisfy the "degree of regularity" element. *Id.* at 66.  It also held that the definite points element was satisfied because the customer purchased an entire tour–one that began and ended at the same point–thus the flight could be considered continuous transportation. *Id.* at 66-67.  The court further noted that even if the intermediate glacier stops transformed the tour into two trips (to and from the glacier), the definite points element was still satisfied because the destination was sufficiently definite in that it was a particular glacier.  *Id.*  The Ninth Circuit concluded that the control element was satisfied because the helicopter operator decided what tours to offer, when to schedule flights, the route to take, where to land, maximum number of passengers, and whether to cancel a flight for lack of sales. *Id.* at 67.

We believe that the decisions in *Schuman*, *Lake Mead*, and *Temsco* correctly interpret the established line exemption.  In addition, as we explain below, plaintiff's operations here are not meaningfully distinguishable from the operations in those cases.

3.      Plaintiff satisfies the three elements required by Treasury Regulation § 49.4263-5(c).

(a)     Plaintiff operates with some degree of regularity

While recognizing that strict regularity of schedule is not required, plaintiff contends, however, that some formal schedule must exist.[7]  In asserting that a formal schedule is required, plaintiff argues, as did the operator in *Schuman*, that "for an aircraft to be operated with 'some degree of regularity,' there would have to be a strict schedule, set by the operator, that

---

[7] Corollary to this proposition, plaintiff relies on Revenue Ruling 66-301, 1966-2 C.B. 475, in which the Service noted that "[a] schedule other than customer demands is necessary if the operation is to be conducted with 'some degree of regularity.'" This reliance is misplaced for two reasons.  First, Revenue Ruling 66-301 is factually distinguishable because it involved a helicopter operator that operated at a community fair lasting only ten days and the operator used neither advance bookings nor reservations.  Second, Revenue Ruling 66-301 was made obsolete by Revenue Ruling 72-622, and although not technically superseded, it is "not considered to be determinative with respect to future transactions."  Rev. Rul. 72-622, 1972-2 C.B. 652.

never varied based on customer demand." *Schuman*, 2011 WL 3956724 at * 9.  The court rejected that standard, however, because "[t]he regulation itself explains that 'some degree of regularity . . . does not necessarily mean that strict regularity of schedule is maintained.'" *Id.* (quoting Treas. Reg. § 49.4263-5(c)).

The *Lake Mead* court analyzed the regularity element by focusing on the "frequency of travel over a certain area."  991 F. Supp. at 1212.  The court looked to Treasury Regulation § 49.4263-5(a), which exempts from the excise tax amounts paid for transportation on small aircraft referred to as "air taxis." *Id.*  Thus, the court noted that, "'air taxis' suggests an airplane for hire, subject to the whims of a particular customer.  Except to the hiring customer, its route is wholly unpredictable and unreliable." *Id.*  Operation on an established line, on the other hand, implies "that the public can rely on the transportation because of a regularity determined by the provider, not the customer, i.e., the whims of customers do not dictate a particular route." *Id.*

We agree with that approach and find that plaintiff satisfies the first element of regularity.   Certainly the regulations do not contemplate an absolutely-fixed schedule, and the terms "regularity" and "regular" have commonly defined meanings which denote following or arranged in a pattern. *See* 13 *Oxford English Dictionary* 522 (2d. 1989).  Thus, if plaintiff's tours operate in a discernable pattern, amounting to a level such that the public could rely on for transportation, plaintiff satisfies the regularity element.

The defendant has submitted two months of plaintiff's tour flight records, which it offers as representative of plaintiff's operations. *See* Def.'s Ex. 26, 27.  After reviewing these records, it is plain to the court that plaintiff's flights operate with a high degree of regularity, as reflected in two of plaintiff's popular tours: the Grand Canyon Picnic and the Sunset tours.

The first month provided is January 2004.[8]  In January, a picnic tour routinely departed between 8:30 AM and 9:00 AM every day except for four days, and in two of those four days, although a picnic tour did not depart, another tour was flown instead.[9]  On the two other days, the morning time slots

---

[8] January 2 and January 7 are unaccounted for.

[9] On January 3, 2004, a two-hour time block in the morning is labeled
continue...

showed no flights due to "weather."  The January 2004 afternoon flights similarly demonstrate a discernable pattern.  On all but two days,[10] plaintiff flew at least one Sunset tour between 2:45 PM and 3:15 PM.

The second month provided is August 2004.[11]  Of the days in August for which we have records, a similar pattern emerges:  at least one picnic tour departed every day between 9:30 AM and 9:45 AM, and, except for one day, at least one Sunset tour departed between 5:15 PM and 5:45 PM.[12]

Although the mere quantity of flights alone cannot be enough to demonstrate an established line, we plainly have more here than just a large number of flights: we have a discernable pattern of the same tours being flown at approximately the same time every day.  A potential customer could have said at the time with a high degree of certainty that plaintiff will fly a Grand Canyon Picnic tour mid-morning and a Sunset tour mid-afternoon.  Because the regulations require only "some degree of regularity," we hold that plaintiff's tour operations satisfy this element.

> (b)      Plaintiff operates between definite points

In its motion for summary judgment, plaintiff argues that the "definite point" element requires two distinct points, and for it to be subject to the tax, the "tours must have taken off and landed at two predetermined, identifiable

---

[9]...continue

as "weather."  On January 12, 2004, although a picnic tour did not depart at 9:00 AM, one "Escape" tour and one "Freedom" tour left at 9:00 AM.  On January 24, 2004, although a picnic tour did not depart at 9:00 AM, a Freedom tour departed.  January 31, 2004, had multiple time slots in the morning labeled as "weather."

[10] In fact, on one of these days, plaintiff flew multiple picnic tours instead of the Sunset tour, and on the other day, plaintiff did fly a Sunset tour, but did so at 3:45 PM.

[11] The exact dates provided are August 5, 2004 through August 30, 2004.  Additionally, the logs for August 13, 21, and 22, 2004 are missing. Plaintiff has not attempted to supplement the exhibit.

[12] On August 29, 2004, the Sunset tour left at 6:15 PM.

locations."  Pl's Mot. Sum. J. 22.  Thus, because a "substantial number of Sundance's flights were circular (i.e., they departed and returned to only one location)," *id.*, plaintiff contends it did not operate on an established line.

We disagree.  The regulation applicable to transportation excises taxes generally, provides that: "It is not necessary that the transportation be between two definite points.  If not otherwise exempt, a payment for continuous transportation beginning and ending at the same point is subject to the tax." Treas. Reg. § 49.4261-1(c).  We agree with both the *Temsco* and *Lake Mead* courts in holding that circular transportation falls within the tax.  *See* 409 Fed. App'x at 66; 991 F. Supp. at 1213.  Plaintiff thus satisfies the requirement that its tours operate between definite points.

(c)     Plaintiff satisfies the control element

The final element of the "operated on an established line" test requires that the flight operator maintain and exercise control over the flights.  *See* Treas. Reg. § 49-4263-5(c); *see also Temsco*, 409 Fed. App'x at 66. Specifically, the regulations contemplate that the operator maintain control "over the direction, route, time, number of passengers carried, etc."  Treas. Reg. § 49.4263-5(c).  Plaintiff designs the pre-packaged tours, including departure and landing locations.  Consequently, plaintiff controls the direction and routes traveled on these tours.  Although minor in-flight deviations can occur, whether those deviations occur on any given flight is ultimately controlled by the pilot or other employees of plaintiff.  Plaintiff also exercises control over the timing of the flights insofar as it actively attempts to direct customers into its preferred model and, incident to that, seeks to fit as many customers into each helicopter as possible.  In other words, rather than simply allowing customers to schedule flights at any time they wish, plaintiff exercises an invisible hand controlling departure times.  The two months of flight logs discussed earlier, show a demonstrable pattern governed by plaintiff's preferred model and active shuffling of passengers.  We hold, therefore, that plaintiff exercises a sufficient quantum of control to render it subject to the tax.

In sum, plaintiff operates on an established line because it operates with some degree of regularity between definite points and maintains the requisite control over numerous aspects of the flights.  Accordingly, it does not fit within the excise tax exemption provided by I.R.C. § 4281.

B.       Plaintiff had a legal obligation to pay the Air Transportation Excise Tax
         to defendant

Plaintiff argues that, even if it was subject to the tax, it had no legal obligation to pay or collect the tax. Section 4261(d) provides that "the taxes imposed by this section shall be paid by the person making the payment subject to the tax."[13]   Admittedly, that would seem to be the individual customers. Section 4291 further provides, however, that, "Except as otherwise provided in section 4263(a), every person receiving any payment for facilities or services on which a tax is imposed upon the payor thereof under this chapter shall collect the amount of the tax from the person making such payment." Because the vast majority of its customers paid third-parties, plaintiff argues that, in most instances, it had no obligation to collect the tax from the customer. Instead, the third-party vendors should be paying the tax.

For its part, defendant relies on I.R.C. § 4263(c), which it asserts shifts the excise tax liability to plaintiff when the tax is not collected at the time of sale. Section 4263(c) provides:

> Where any tax imposed by section 4261 is not paid at the time
> payment for transportation is made, then, under regulations
> prescribed by the Secretary, to the extent that such tax is not
> collected under any other provision of this subchapter such tax
> shall be paid by the carrier providing the initial segment of such
> transportation which begins or ends in the United States.

Plaintiff asserts that the liability imposed by I.R.C. § 4263(c) is secondary only, i.e., the government must first seek to collect from the individual customer. Alternatively, plaintiff argues that because the Secretary has not promulgated regulations to implement I.R.C. § 4263(c), the section is of no effect.

---

[13] Section 4261(d) also provides an exception for payments under I.R.C. § 4263(a), which concerns payments made outside of the United States and is of no application in this case.

16

      1.      Primary versus secondary liability

To support its argument that customers or third-party vendors are the proper payors of the tax, plaintiff cites to *Lake Mead*, which held that although the tour company operated on an established line, it had no legal duty to collect the excise taxes: "the passenger is liable for the tax (section 4261), but section 4291 requires the entity receiving payment from the passenger to collect the tax and pay it over to the Government." 991 F. Supp. at 1213-14. Plaintiff's reliance on *Lake Mead*, however, is misplaced because the court there was applying a prior (and now obsolete) version of I.R.C. § 4263(c).

In 1992, the end of the tax period audited in *Lake Mead*, I.R.C. § 4263(c) read as follows:

> Where any tax imposed by section 4261 is not paid at the time payment for transportation is made, then, under regulations prescribed by the Secretary, to the extent that such tax is not collected under any other provision of this subchapter–
>
>     (1) such tax shall be paid by the person paying for the transportation or by the person using the transportation;
>
>     . . .
>
>     (3) payment of such tax shall be made to the Secretary, to the person to whom the payment for transportation was made, or, in the case of transportation other than transportation described in section 5262(a)(1), to any person furnishing any portion of such transportation.

26 U.S.C. § 4263(c) (1994).

The prior version of I.R.C. § 4263(c) thus placed no payment obligation on the air carrier. Section 1031 of the Taxpayer Relief Act of 1997, Pub.L. 105-34, as the *Lake Mead* court noted, however, amended I.R.C. § 4263(c) by: "striking 'subchapter--' and all that follows and inserting 'subchapter, such that tax shall be paid by the carrier providing the initial segment of such transportation which begins or ends in the United States.'" 991 F. Supp. at 1217 (internal quotations omitted). As the court further noted, this amendment was a modification, not a clarification of the then-existing law. In other words,

as the Senate report noted, the provisions imposing liability for the tax were "modified to impose secondary liability on air carriers." S. Rep. 105-33, at 162 (1997). Thus, the *Lake Mead* court held that when the taxes were assessed, the then-existing law did not impose liability on air carriers. *See* 991 F. Supp. at 1218. That is no longer the case.

The current version of I.R.C. § 4263(c), which was in effect during the disputed period, requires the carrier providing the initial segment of transportation to pay the tax if it is not otherwise collected. *See Temsco*, 409 Fed. App'x at 67. In attempts to parry the plain language of I.R.C. § 4263(c), plaintiff argues that only *secondary* liability is imposed on air carriers. We disagree.

The plain language of I.R.C. § 4263(c) provides that the air carrier is to pay the tax if it is not otherwise collected. There is no mention of primary versus secondary liability in the text of the statute. Furthermore, as the Ninth Circuit noted in *Temsco*, nothing in the text of the statute requires the government to first attempt collection from the tour purchaser. *See Temsco*, 409 Fed. App'x at 67. "[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004); *see also United States v. Gonzales*, 520 U.S. 1, 9 (1997) ("[T]he straightforward language [of the statute] leaves no room to speculate about congressional intent."). The language of I.R.C. § 4263(c) clearly imposes a payment obligation on the air carrier.

2.     Regulations under I.R.C. § 4263 are not a precondition to the section's application

Plaintiff also argues that Treasury's failure to adopt implementing regulations means that I.R.C. § 4263(c) is unenforceable. We disagree.

The Tax Court has developed what we view to be an appropriate test in determining whether the issuance of such regulations is a precondition to the application of the statute. The rule, set out in *Estate of Neumann v. Commissioner*, 106 T.C. 216 (1996), draws a distinction between regulations that explain "how" the tax is collected and regulations that dictate "whether" the tax is collected. *See* 106 T.C. at 219. *See generally* Phillip Gall, *Phantom Tax Regulations: The Curse of Spurned Delegations*, 56 *Tax Lawyer* 413, 444-45 (2003). A tax statute is self-executing if the regulation referred to in the statute deals only with how, not whether, the tax is to be applied. *See*

18

*Occidental Petro. Corp. v. Comm'r*, 82 T.C. 819, 829 (1984) ("Congress could hardly have intended to give the Treasury the power to defeat the legislatively contemplated operative effect of [a provision] merely be failing to discharge the statutorily imposed duty to promulgate the required regulations."); *see also Int'l Multifoods Corp. v. Comm'r*, 108 T.C. 579, 587 (1997).

The Seventh Circuit took a similar approach in *Pittway Corp. v. United States*, 102 F.3d 932 (7th Cir. 1996). There, the court held that the failure to adopt regulations did not preclude applicability of a statute defining certain taxable chemicals for excise tax purposes. The statute in that case read: "Under regulations prescribed by the Secretary, methane or butane shall be treated as a taxable chemical only if it is used otherwise than as a fuel . . . ." I.R.C. § 4662(b)(1). The court held that Congress made it plain in the text of the statute that butane was to be treated as taxable. The court further noted that "Even if there were regulations, we would have to question them if they suggested a different result." 102 F.3d at 936.

It is plain from the text of I.R.C. § 4263(c) that Congress sought to place final liability of the tax on the transportation provider. The intent to tax is clear. The regulations, therefore, could deal only with how, not whether, the payments are to be made. *See Temsco*, 409 Fed. App'x at 67 ("The language of the statute and its legislative history do not establish that the regulations are a precondition to applying § 4263(c)."). Thus, plaintiff had a legal obligation to pay the excise tax to defendant.

C.   Because genuine disputes as to material facts exist relating to the amount of tax owed, summary judgment is not appropriate

Plaintiff's final argument is that the IRS erroneously calculated the assessment because it did not exclude non-air transportation related services, and that the IRS thus improperly calculated the penalties assessed against it. In response, defendant argues that the burden is on plaintiff to put forward sufficient undisputed evidence of non-air-transportation-related charges to warrant summary judgment and that it has not done so. It points to Treasury Regulation § 49.4261-2(c), which provides, *inter alia*, that "charges for the [non-transportation] services may be excluded in computing the tax payable with respect to such payment, provided that such charges are separable and are shown in the exact amounts thereof in the records pertaining to the transportation charge." If the charges for non-transportation services are not

19

separable, then "the tax must be computed upon the full amount of the payment." *Id.*

Tax assessments enjoy a presumption of correctness, and "a taxpayer bears the burden of proving it to be wrong." *Conway v. United States*, 326 F.3d 1268, 1278 (Fed. Cir. 2003) (internal quotations omitted). Thus, to survive summary judgment on this issue, plaintiff must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In its proposed findings of fact, plaintiff submits that it incurred non-air-transportation expenses such as "ground transportation, meals, beverages, videotapes, DVDs, photographs, National Park Entrance and Overflight fees, tour narration and a variety of other services – even the occasional wedding." Pl.'s Prop. Find. Fact 10. Plaintiff cites to the deposition of Richard Eisenreich, plaintiff's corporate secretary, in which he states that the price of a ticket included such non-air transportation expenses such as meal costs, vehicle costs, and national park fees. *See* Pl.'s Ex. at 626- 72, 642, 646. We agree with defendant that this evidence would not be sufficient, by itself, to meet plaintiff's burden of proving that the amount of assessment is incorrect. We think it premature, however, to rule on summary judgment that plaintiff is incapable of adducing more particularized evidence.

Plaintiff also argues that it is entitled to offset against any Air Transportation Excise Tax owed what it has paid in Aviation Fuel Excise Tax. Defendant does not dispute the premise behind plaintiff's argument that it is entitled to an offset for any fuel tax paid, but points out that plaintiff has provided no specific proof of the amounts involved. We agree with defendant that generalized assertions that Sundance has paid the fuel tax will ultimately be insufficient to warrant an offset. At this stage in the litigation, however, having concluded that plaintiff is incorrect with respect to the underlying legal issues, we believe it appropriate to allow plaintiff to assemble whatever proof it has on the quantum of offset. We therefore decline to address, for now, the amount of tax owed, including whether plaintiff willfully neglected to pay the excise tax.

In sum, we hold that plaintiff was subject to the Air Transportation Excise Tax during the disputed period for its non-charter flights and that plaintiff had a legal duty to remit those taxes to defendant. Disputes remain as to whether plaintiff is entitled to an offset for fuel excise taxes paid, whether it can demonstrate that portions of its revenues relate to services not

subject to the flight excise tax, and whether plaintiff is subject to penalties for willful failure to collect and pay the tax.

## CONCLUSION

For the reasons stated above, we deny plaintiff's motion for summary judgment and grant in part and deny in part defendant's cross-motion for summary judgment.  The parties shall submit a joint status report on how they would like to proceed by March 30, 2012.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge

21